Filed 11/22/16

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re O.C. et al., Persons Coming Under the Juvenile Court Law. | |
| MENDOCINO COUNTY HEALTH & HUMAN SERVICES AGENCY, CHILDREN AND FAMILY SERVICES, <br><br>     Plaintiff and Respondent, <br><br> v. <br><br> A.C. et al., <br><br>     Defendants and Appellants. | A147577 <br><br> (Mendocino County Super. Ct. Nos. SCUK-JVSQ-14-1702501 & SCUK-JVSQ-14-1702601) |

The parents of minors O.C. and M.C. appeal from the juvenile court's order terminating their parental rights. (Welf. & Inst. Code, § 366.26.)[1] Father A.C. (Father) contends the order must be reversed because the trial court failed to comply with the notice requirements of the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.) (ICWA). Mother joins in that argument. She also contends the order must be reversed because minor M.C. is not adoptable, and because the sibling bond exception to adoption applies. We reject Mother's separate contentions but reverse for ICWA error.

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II and III of the Discussion section.

[1] Unless otherwise indicated, all statutory references are to the Welfare and Institutions Code.

## COMBINED STATEMENT OF CASE AND FACTS

### *Initial Detention, Jurisdiction and Disposition*

O.C., age two, and M.C., age four, were detained after their parents' residence was raided by the Mendocino Major Crimes Task Force on June 24, 2014. On June 27, 2014, the Mendocino County Health & Human Services Agency, Children and Family Services (Agency) filed a section 300 petition against both parents alleging, among other things, that the parents were engaged in marijuana cultivation and other illegal activity and were unable to meet the children's basic needs, including a safe and hazard-free home. Both parents were alleged to have substance abuse problems that made them unable to care properly for their children, and Father was in Mendocino County jail. Following argument, the parents submitted on the Agency's report for detention and the children were ordered detained.

At the jurisdiction hearing on July 23, 2014, the parties agreed to certain amendments to the petition, then Mother and Father submitted on the amended allegations and the court found the amended allegations true. The boys were placed together in a shelter home. Father remained in county jail. At the disposition hearing on August 28, 2014, the court ordered the children to be returned to Mother under a family maintenance plan.

### *Section 387 Petition, Joint Jurisdiction-Disposition Hearing, and Six-month Review.*

On October 7, 2014, the Agency filed a supplemental petition after mother was arrested in another task force raid in which drug paraphernalia and honey oil were found within the children's reach on the property. The children were detained. On November 4, 2014, a joint jurisdictional and dispositional hearing was held, and parents submitted on the reports. Both parents were in custody. Mother was ordered into reunification services.

On April 21, 2015, Father's services were terminated for lack of compliance and because he would be serving a five-year state prison sentence. Mother was also in

2

custody and her services were terminated for lack of compliance and inability to have the children returned to her by the 12-month review.  Visitation for parents was set at one time per month if allowed by their respective penal institutions.  Over mother's objection, visitation was terminated on July 23, 2015, due to the distance between the parents' custodial settings and the children.  Mother was at the Central California Women's Facility in Chowchilla and Father was at San Quentin State Prison.

**Section 366.26 Hearings**

The Agency filed a report recommending termination of parental rights and an adoption report finding both children adoptable on July 30, 2015.  At the hearing held on August 20, 2016, adoptions specialist Janice Milthaler testified in favor of the children's adoptability.  Parents offered no evidence.  The court found both children adoptable, but did not terminate parental rights at that time because no adoptive families had been as yet identified.

The Agency filed a second report recommending termination of parental rights and an adoption report finding both children adoptable.  Adoptive families for each child had been identified.  At a hearing on February 9, 2016, the court found the exception to adoption for sibling bond preservation did not apply and terminated parental rights.

**ICWA-related Facts**

The minors' possible Wailaki Native American ancestry was first noted by the Agency in the initial petition.[2]  Based on Mother's report, the detention summary stated Father had Native American heritage with a Wailaki tribe, and Mother had no Indian ancestry.  At the detention hearing, Father's attorney informed the court that Father had provided to the social worker a completed ICWA-020 form indicating he had both Wailaki and Pomo heritage.  Mother's attorney stated she had no Native American

---

[2] The petition included an ICWA-010(A) form on which Mother indicated the children may have Indian ancestry and are or may be members of or eligible for membership in a Wailaki tribe.

ancestry. However, on June 27, 2014, Mother completed an ICWA "Parent History Chart" indicating she was the minors' biological parent, born in New Mexico, and had potential Mohawk ancestry through her deceased grandmother, Kristen A., who was born on June 19, possibly in 1957. She provided a phone number and address for her grandfather, who was still alive. She also claimed Mohawk ancestry through her great-grandfather, Joseph E. of McNabb Ranch, who also was alive.

On June 27, 2014, Father signed an ICWA-020 form ("Parental Notification of Indian Status"), averring under penalty of perjury he is or may be a member of, or eligible for membership in, the Wailaki and Pomo tribes. The ICWA-020 signed by father was filed with the court.[3] On June 30, 2014, Father completed an ICWA "Parent History Chart" indicating he was the biological father of the minors, born in Covelo, and was enrolled as a child in the Round Valley tribe. He claimed Indian ancestry through his father, "Steve," whom he had never met but believed was possibly a member of the Covelo tribe. He listed the name, date of birth, address and phone number for his adoptive mother, who had no known tribal affiliation, and who was listed as one of the persons giving information.

In the jurisdictional report filed July 14, 2014, the Agency noted Mother's possible Wailaki and Mohawk ancestry and Father's possible Native American ancestry with the Round Valley band of Pomo Indians, and indicated it had noticed the Bureau of Indian Affairs (BIA), the Secretary of the Interior, and the Mohawk, Wailaki, and Round Valley tribes.

On July 24, 2014, the Agency mailed ICWA-030 [4] notices of the dispositional hearing to be held on August 19, 2014 to (1) the Sacramento Area Director of the BIA,

---

[3] There is no record evidence mother signed an ICWA-020 or filed one with the court.

[4] These ICWA notices included the information that had been listed on both parents' history charts. The Wailaki Indians of California are members of the Grindstone

4

(2) the Secretary of the Interior in Washington, D.C., (3) Kenneth Wright, President of the Round Valley Tribe (Pomo Indians) in Covelo, California; (4) Donald Arnold, Chairperson of the Scotts Valley Rancheria, in Lakeport, California (Pomo Indians), (5) Ronald Kirk, Chairman of the Grindstone Rancheria in Elk Creek, California; and (6) Paul O. Thompson, Ronald W. LaFrance, Jr., and Randy Hart, Chiefs of the St. Regis Mohawk Tribe in Akwesasne, New York. As of August 18, 2014, signed receipts for certified mail had been returned from all notified parties except the Secretary of the Interior. As of the disposition hearing on August 19, 2014, only the Pomo Indians of the Scotts Valley band had returned a determinative response to the ICWA notice. They reported they would not intervene in the dependency proceedings; neither Mother, Father, nor the minors were enrolled members of the tribe and "[e]nrollment is a prerequisite for membership under Scotts Valley's Tribal law and custom."

On September 11, 2014, the Agency mailed ICWA-030 notices of the ICWA review hearing to be held on September 24, 2014, to the Sacramento Area Director of the BIA, the Secretary of the Interior, Kenneth Wright of the Round Valley Band of Pomo Indians, Ronald Kirk of the Grindstone Rancheria, and the Chiefs of the St. Regis Mohawk Tribe, at the addresses noted above. On September 2, 2014, the Agency received a letter from the Saint Regis Mohawk Tribe indicating the tribal clerk's office had researched the names of the biological parents and other listed relatives and had been "unable to find any link of tribal affiliation"; therefore, the minors were not enrolled or eligible for enrollment with the tribe and no further notices to the tribe were required.

On October 7, 2014, the court found 60 days had elapsed from the time notice had been given to the Wailaki and Round Valley Pomo and no determinative response from them had been received. Since the Mohawk tribe and Scotts Valley band of Pomo Indians had responded the minors were not eligible for membership in those tribes,

Rancheria (http://www.narf.org/nill/tribes/grindstone_rancheria.html as of Nov. 22, 2016).

ICWA did not apply to the case unless further evidence of the applicability of ICWA was later received. At both section 366.26 hearings, the court found ICWA did not apply.

## DISCUSSION

### I.   *ICWA Notice*

It is undisputed that no Pomo Indian Tribes or Bands other than the Round Valley and Scotts Valley Bands were noticed. Parents argue the order terminating parental rights must be reversed because the trial court and the Agency did not comply with ICWA and state law by sending notices to all of the tribes or bands of Pomo Indians, as required by *In re J.T.* (2007) 154 Cal.App.4th 986 (*J.T.*).[5] The Agency relies on *In re Edward H.* (2002) 100 Cal.App.4th 1 (*Edward H.*), which held that "notice to some but not all possible tribes in which a dependent child may be eligible for membership does not violate the ICWA provided the Bureau of Indian Affairs also receives notice . . . ." (*Edward H.*, at p. 3.)

"Congress enacted ICWA in 1978 'to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families . . . .' (25 U.S.C. §1902.)" (*In re Damian C.* (2009) 178 Cal.App.4th 192, 196.) "ICWA reflects a congressional determination that it is in the best interests of Indian children to retain tribal ties and cultural heritage and in the interest of the tribe to preserve its future generations." (*In re Kadence P.* (2015) 241 Cal.App.4th 1376, 1385 (*Kadence P.*).) Pursuant to title 25 United States Code section 1912(a), "In any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe,

---

[5] Even if Mother does not have Indian ancestry, she has standing to raise ICWA compliance issues. (*In re B.R.* (2009) 176 Cal.App.4th 773, 779.) In general, ICWA notice issues may be raised for the first time on appeal even if they were not raised below. (*J.T.*, *supra*, 154 Cal.App.4th at p. 991; *In re Nikki R.* (2003) 106 Cal.App.4th 844, 849; *In re Isaiah W.* (2016) 1 Cal.5th 1, 10 (*Isaiah W.*).

6

by registered mail with return receipt requested, of the pending proceedings and of their right of intervention." Welfare and Institutions Code section 224.2, subdivision (a)(1) similarly provides that if the court, a social worker, or a probation officer knows or has reason to know that an Indian child is involved, notice to the tribe "shall be sent by registered or certified mail with return receipt requested." " 'Notice is a key component of the congressional goal to protect and preserve Indian tribes and Indian families. Notice ensures the tribe will be afforded the opportunity to assert its rights under [ICWA] irrespective of the position of the parents, Indian custodian or state agencies.' " (*In re Alice M.* (2008) 161 Cal.App.4th 1189, 1195 (*Alice M.*).)

California has the second largest Indian population in the country. (*In re Abbigail A.* (2016) 1 Cal.5th 83, 91 (*Abbigail A.*), citing U.S. Dept. of the Interior, BIA, 2013 American Indian Population and Labor Force Report (Jan. 16, 2014) p. 10 [281,374 Native Americans].) According to the California Department of Social Services (CDSS), this includes 22 bands and rancherias affiliated with the Pomo tribe.[6] Nevertheless, in 2006, due to "persistent noncompliance with ICWA" (*Abbigail A.*, at p. 91), legislation was enacted to "incorporate[] ICWA's requirements into California statutory law" (*In re W.B.* (2012) 55 Cal.4th 30, 52; see §§ 224–224.6). These provisions "affirm ICWA's purposes [citation] and mandate compliance with ICWA." (*Isaiah W.*, *supra*, 1 Cal.5th at p. 9.)

In *Edward H.*, *supra*, 100 Cal.App.4th 1, after the father indicated he had reason to believe he belonged to a tribe out of Arkansas, inquiry was made and notice was sent to two Choctaw tribes and the BIA. (*Id.* at p. 4.) Neither the tribes nor the BIA declared the children to be Indian children under ICWA, and at the section 366.26 hearing the trial court found ICWA did not apply. On appeal from the termination of his parental rights,

---

[6] See the CDSS's website at http://www.childsworld.ca.gov/res/pdf/cdsstribes.pdf, pp. 34–36, as of November 22, 2016.

7

father argued a third Choctaw tribe should have been notified. As noted, the *Edward H.* court held notice to the BIA was sufficient. At the time, former California Rules of Court,[7] rule 1439(f)(3) required notice to "all tribes of which the child may be a member or eligible for membership." However, the court declined to follow the rule because it did not "track the federal statutory language on this issue." (*Edward H.*, at p. 4.) Federal law required notice to the Indian's child's *tribe* (25 U.S.C. § 1912(a)) and authorized service of notice upon the Secretary of the Interior " '[i]*f the identity or location of . . . the tribe cannot be determined . . . .' "* (*Edward H.*, at p. 5, italics added.) " 'Under the statutory scheme, the burden of identifying and providing notice to the proper tribe in these circumstances *shifts* from the state court to the Secretary, who presumably has resources and skill with which to ferret out the necessary information.' " (*Ibid.*) Since, in the court's view, the identity of the actual Choctaw tribe in which the children might be eligible for membership was unknown, the BIA as well as an Indian tribe was authorized to "conclusively determine whether a child is an Indian." (*Ibid.*)

*Edward H.* was decided well before the enactment of the 2006 legislation that governs this case, and the court in *J.T.* declined to follow *Edward H.* "[i]n light of this superseding legislation." (*J.T., supra*, 154 Cal.App.4th at p. 993; see *Alice M.*, *supra*, 161 Cal.App.4th at p. 1202 [following *J.T.*].) In *J.T.,* the mother identified possible Sioux and Cherokee ancestry. Authorized federal and California lists identified three Cherokee tribes and 16 Sioux tribes. (*J.T.*, at p. 992.) The Bureau of Children and Family Services argued that service of the notices on the BIA was sufficient because "the identity or location of . . . the tribe cannot be determined . . . ." (25 U.S.C. § 1912(a).) Looking to the purpose and notice requirements of the then recently enacted statutes codifying ICWA as a feature of state law under Senate Bill No. 678 (2005-2006 Reg. Sess., ch. 838), and to preexisting rules of court and court opinions, the *J.T.* court

---

[7] All references to rules are to the California Rules of Court.

8

concluded that notice must be sent to all of the Sioux tribes. The *J.T.* court reasoned that section 224.2 had incorporated former rule 1439's requirement of notice to all tribes of which the minor may be a member or eligible for membership. Section 224, subdivision (d) had adopted the federal requirement that heightened state law standards shall prevail over more lenient ICWA requirements. And sections 224, subdivision (a) and 224.3 subdivision (a) imposed an affirmative and continuing duty *to inquire* about a minor's potential Indian ancestry, required notice if the court knows or has reason to know the child is or may be an Indian child, and mandated varied biographical data be included on the notice forms. (*J.T.*, at p. 993.)

In *Alice M., supra*, 161 Cal.App.4th 1189, the mother answered "American Indian, Navajo-Apache" in response to a question on the "Parental Notification of Indian Status" form asking if the minor child " 'is or may be a member of, or eligible for membership in, a federally recognized Indian tribe.' " (*Id*. at p. 1194.) Notices were sent to all federally recognized Navajo and Apache tribes, but the Court of Appeal determined the notices did not meet the requirements of federal or state law. (*Id*. at pp. 1197–1201.)

The court also held that notice to the BIA was not an adequate substitute for inadequate notice to the tribes. "Section 224.2, subdivision (a)(3), effective January 1, 2007, requires that notice 'be sent to all tribes of which the child may be a member or eligible for membership, until the court makes a determination as to which tribe is the child's tribe . . . .' In a case such as this, the language of subdivision (a)(3) must be construed as requiring notice to *all* federally recognized tribes within the general umbrella identified by the child's parents or relatives. Based on the information provided by appellant, all recognized Apache tribes are 'tribes of which [Alice] may be a member,' even if the family's precise tribal affiliation, if any, has not been determined. [¶] As the First District Court of Appeal concluded in *In re J.T.*[, *supra*, 154 Cal.App.4th 986], the statutory adoption of the higher standard in section 224.2 prevails 'over more lenient ICWA requirements' and undermines the rationale of *Edward H.* The application of the

broader 'all tribes' requirement, which may be viewed as more protective of the tribes than the ICWA requirement, is supported by statute. Subdivision (d) of section 224 states that '[i]n any case in which this code or other applicable state or federal law provides a higher standard of protection to the rights of . . . the Indian child's tribe, than the rights provided under [ICWA], the court shall apply the higher standard.' We therefore conclude that notice to the BIA is not an adequate substitute, in this case, for notice to all federally recognized Apache tribes." (*Alice M.*, *supra*, 161 Cal.App.4th at p. 1202.)

The Agency argues that our Supreme Court's opinion in *Abbigail A.*, *supra*, 1 Cal.5th 83 has breathed new life into *Edward H.*, effectively overruling *J.T.* We disagree. *Abbigail A.* involved the validity of former rule 5.482(c). At that time, the rule provided: " 'If *after notice has been provided as required by federal and state law* a tribe responds indicating that the child is eligible for membership if certain steps are followed, *the court must proceed as if the child is an Indian child and direct the appropriate individual or agency to provide active efforts . . . to secure tribal membership for the child.*' " (*Abbigail A.*, *supra*, 1 Cal.5th at pp. 91–92, first italics added, second italics in original.) In *Abbigail A.*, the children's biological and presumed father informed the court "he believed he had Cherokee ancestry. *To obtain the information necessary to determine whether Abbigail and Justin were Indian children to whom ICWA applied*, the court ordered the Department of Health and Human Services (DHHS) to notify the relevant *tribes* pursuant to federal and state law. (See 25 U.S.C. § 1912(a); Welf. & Inst. Code, § 224.2, subd. (a).)" (*Abbigail A., supra*, 1 Cal.5th at pp. 88–89, italics added.)[8] One of these tribes, the Cherokee Nation, informed DHHS the children were eligible for enrollment and affiliation with the Cherokee Nation by virtue of their direct lineage to father's great-grandmother, an enrolled member. (1 Cal.5th at p. 89.) However, the

---

[8] According to the California Department of Social Services' Childsworld website, there are three tribes with Cherokee affiliation (www.childsworld.ca.gov/res/pdf/cdsstribes.pdf, p. 5, as of Nov. 22, 2016).

10

children were not "Indian children" under federal law (25 U.S.C. § 1903(4)) because neither biological parent was a member. (*Abbigail A.*, at p. 89.) The Cherokee nation recommended " 'applying all the protections of ICWA to this matter from the beginning of the case . . . [to] prevent future delays . . . if or when the parents or child/children become enrolled members.' " (*Ibid.*)

The father informed the trial court he intended to apply for membership. Over the DHSS's objection, the trial court stated it would proceed as if the children were Indian children to whom ICWA applied, and directed the DHHS and counsel to make reasonable efforts to secure tribal membership for the children. The court held jurisdictional and dispositional hearings that complied with both state and federal law, assumed jurisdiction, and placed the children with their maternal grandmother, which placement also complied with ICWA. (25 U.S.C. § 1915(b)(i).) (*Abbigail A., supra*, 1 Cal.5th at p. 90.) DHHS's appeal challenged the validity of former rule 5.482(c) and rule 5.484(c)(2), and argued the court erred by proceeding *as if* ICWA applied and directing the agency to make efforts to secure tribal membership for the children. DHSS did not challenge the court's jurisdictional or dispositional orders. (*Ibid.*)

The Supreme Court concluded rule 5.482(c) was invalid as a matter of state law because " '[t]he primary objective of Senate Bill No. 678,' which incorporated ICWA's requirements and definitional provisions into California statutory law, 'was to *increase compliance* with ICWA.' [Citations.] Nothing in the bill's language or history demonstrates the Legislature intended to apply ICWA's requirements to, or require membership applications be made on behalf of, children who are not Indian children as defined in ICWA. Instead, the Legislature left cases not involving Indian children subject to the statutes generally applicable in dependency proceedings. Rule 5.482(c) is inconsistent with those statutes." *(Abbigail A., supra,* 1 Cal.5th at pp. 92–93.)

One of several arguments rejected by the court was father's argument that section 224, subdivision (d)'s "higher standard of protection" afforded by section 224,

11

subdivision (d) validated rule 5.482(c).  The court observed section 224, "like the related federal statutes, speaks only to the rights of persons and tribes connected with '*an Indian child.*'  (Welf. & Inst. Code, § 224, subd. (d), italics added.)  Section 224 cannot reasonably be understood to authorize the adoption of, or require deference to, a rule purporting to apply ICWA's requirements in cases involving children who are not Indian children.  By analogy, another court has explained that 'ICWA's "minimum federal standards" language refers to "the *removal* of Indian children," . . .; it does not refer to the *definition* of an "Indian child."  [Citations.]  . . .  [N]othing in ICWA suggests that the definition of "Indian child" . . . is a "minimum federal standard." ' "  (*Abbigail A.*, *supra*, 1 Cal.5th at p. 93.)

By contrast, the court found rule 5.484(c)(2)[9] was valid because it did not direct the court to act " 'as if' a child were an Indian child," but rather spoke "only to the court's obligations in a case involving an 'Indian child' as defined by law.  Read in this manner, according to its plain language, the rule is not inconsistent with any state statute implementing ICWA."  (*Abbigail A., supra*, 1 Cal.5th at p. 96.)  The court also clarified that the trial court was free to "direct that steps be taken to pursue tribal membership for a child who, while not a member of a tribe, is already an Indian child to whom ICWA applies because he or she is both eligible for membership and also the biological child of a member."  (*Id*. at pp. 96–97.)

---

[9] Rule 5.484(c)(2) provides:  "In addition to any other required findings to place an Indian child with someone other than a parent or Indian custodian, or to terminate parental rights, the court must find that active efforts have been made . . . to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family, and must find that these efforts were unsuccessful.  [¶] . . . [¶] (2) Efforts to provide services must include pursuit of any steps necessary to secure tribal membership for a child if the child is eligible for membership in a given tribe, as well as attempts to use the available resources of extended family members, the tribe, tribal and other Indian social service agencies, and individual Indian caregivers."

Because notice had already been given to the Cherokee Nation in accordance with federal and state law, questions concerning what kind of information triggers a duty of inquiry and notice, or to whom notice must be given, or whether the notice given was proper or sufficient, were not before the court in *Abbigail A.* "[C]ases are not authority for propositions not considered." (*People v. Alvarez* (2002) 27 Cal.4th 1161, 1176.)

Furthermore, this case, unlike *Abbigail A.*, does not involve the validity of a rule of court under state law. At issue here is one of the very statutes enacted to ensure compliance with ICWA, namely, section 224.2, which expressly provides that whenever "the court, a social worker, or probation officer knows or has reason to know that an Indian child is involved, any notice sent in an Indian child custody proceeding under this code shall be sent to . . . [¶] . . . [¶] (c) . . . *all tribes of which the child may be a member or eligible for membership, until the court makes a determination as to which tribe is the child's tribe*[,] . . . after which notice need only be sent to the tribe determined to be the Indian child's tribe." (§ 224.2, subd. (a)(3), italics added.) Section 224.2 is in line with the BIA's recently revised Guidelines for State Courts and Agencies in Indian Child Custody Proceedings, which supersede and replace the guidelines published at 44 Federal Register 67584 (Nov. 26, 1979). (See U.S. Dept. of the Interior, Bureau of Indian Affairs, Guidelines for State Courts and Agencies in Indian Child Custody Proceedings, 80 Fed.Reg. 10146 (Feb. 25, 2015) (BIA Guidelines).)[10][11]

---

[10] For example, BIA Guideline section A.3 [When does ICWA Apply?] states: "(c) Agencies and State courts, in every child custody proceeding, must ask whether the child is or could be an Indian child and conduct an investigation into whether the child is an Indian child. . . . [¶] (d) If there is any reason to believe the child is an Indian child, the agency and State court must treat the child as an Indian child, unless and until it is determined that the child is not a member or is not eligible for membership in an Indian tribe." (80 Fed. Reg. 10152.)

Guideline section B.2 [What actions must an agency and State court undertake in order to determine whether a child is an Indian child?] states: "(a) Agencies must ask whether there is reason to believe a child that is subject to a child custody proceeding is an Indian child. If there is reason to believe that the child is an Indian child, the agency

13

Finally, to extend the rationale of *Abbigail A.* to ICWA's notice requirements makes no sense. The purpose of ICWA's notice requirements is *to identify* children who are Indian children, and, if a child is identified as an Indian child, give the tribe or tribes in which the child is a member or may be eligible for membership advance notice of pending dependency proceedings so they may intervene in the proceedings or assert jurisdiction over the child as the tribe or tribes deem fit. (See *Isaiah W., supra*, 1 Cal.5th at p. 5 ["[ICWA's] notice requirement, which is also codified in California law [§ 224.2], enables a tribe to determine whether the child is an Indian child and, if so, whether to intervene in or exercise jurisdiction over the proceeding."].) Nothing in *Abbigail A.*

---

must obtain verification, in writing, *from all tribes in which it is believed that the child is a member or eligible for membership*, as to whether the child is an Indian child. [¶] (b) State courts must ask, as a threshold question at the start of any State court child custody proceeding, whether there is reason to believe the child who is the subject of the proceeding is an Indian child by asking each party to the case, including the guardian ad litem and the agency representative, to certify on the record whether they have discovered or know of *any information that suggests or indicates the child is an Indian child*. [¶] . . . [¶] (c) An agency or court has reason to believe that a child involved in a child custody proceeding is an Indian child if: [¶] . . . [¶] (2) Any agency involved in child protection services or family support has discovered *information suggesting* that the child is an Indian child." (80 Fed. Reg. 10152, italics added.)

Guideline section B.4 [What is the procedure for determining an Indian child's tribe when the child is a member or eligible for membership in more than one tribe?] states: "(a) Agencies are required to notify *all tribes, of which the child may be a member or eligible for membership*, that the child is involved in a child custody proceeding. The notice should specify the other tribe or tribes of which the child may be a member or eligible for membership." (80 Fed.Reg. 10153, italics added.)

Significantly, "[t]he updated guidelines delete the provision allowing BIA, in lieu of the tribe, to verify the child's status. This provision has been deleted because it has become increasingly rare for the BIA to be involved in tribal membership determinations, as tribes *determine their own membership*. [Citation.] BIA may assist in contacting the tribe to ensure a determination, however." (80 Fed. Reg. 10148, italics added.)

[11]The BIA's guidelines are instructive but not binding on state courts. (*Kadence P.*, *supra*, 241 Cal.App.4th at p. 1387, fn. 10; see also *National Council for Adoption v. Jewell* (E.D.Va. 2015) 156 F.Supp.3d 727,736 ["[t]he 2015 Guidelines are non-binding interpretive rules not subject to APA notice-and-comment procedures."].)

suggests that section 224.2 gives tribes "heightened protections" not otherwise afforded by federal law, that section 224.2 is inconsistent with federal law, or that *J.T.* has been overruled sub silentio.

This point is underscored by *Isaiah W., supra*, 1 Cal.5th 1, decided one week before *Abbigail A.*, which does discuss notice issues. Isaiah was removed from his parents at birth and placed in foster care. (1 Cal.5th at p. 5.) Although the mother indicated she may have Indian ancestry (*id.* at p. 6), and the Department developed information indicating Isaiah's grandfather may have had Blackfoot ancestry and his great-great-grandmother may have been a member of the Cherokee tribe, the court concluded the possibility Isaiah was an Indian child was "too attenuated and remote" to warrant notice to tribes or the BIA. (*Ibid.*)

The mother did not appeal from the dispositional order or object to or appeal from the court's ICWA finding. (*Isaiah W.*, *supra*, 1 Cal.5th at p. 6.) A year later, the court terminated the mother's parental rights and again ruled it had no reason to know that Isaiah was an Indian child. The mother appealed the court's termination of her parental rights, arguing the trial court had reason to know Isaiah was an Indian child but failed to comply with ICWA's notice requirements. (*Id*. at p. 7.) The Court of Appeal found mother was foreclosed from raising that issue on appeal from the order terminating her parental rights because she had failed to timely appeal from the court's ICWA finding and dispositional order. (1 Cal.5th at p. 7.) The Supreme Court reversed, holding that "[b]ecause ICWA imposes on the juvenile court a continuing duty to inquire whether the child is an Indian child, . . . the parent may challenge a finding of ICWA's inapplicability in an appeal from the subsequent order, even if she did not raise such a challenge in an appeal from the initial order." (1 Cal.5th at p. 6.)

*Isaiah W.*'s holding rests on the centrality of ICWA's notice requirements. ICWA establishes " 'minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect

15

the unique values of Indian culture . . . .' (25 U.S.C. § 1902.)" (*Isaiah W.*, *supra*, 1 Cal.5th at p. 8.) These minimum standards "include the requirement of notice to Indian tribes in any involuntary proceeding in state court to place a child in foster care or to terminate parental rights 'where the court knows or has reason to know that an Indian child is involved.' (25 U.S.C. § 1912(a).) . . . [¶] ICWA's notice requirements serve two purposes. First, *they facilitate a determination of whether the child is an Indian child under ICWA.* (25 U.S.C. § 1903(4) [defining Indian child as 'any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe'].) . . . [¶] Second, ICWA notice ensures that an Indian tribe is aware of its right to intervene in or, where appropriate, exercise jurisdiction over a child custody proceeding involving an Indian child." (*Isaiah W.*, at p. 8, italics added.)

"[A] juvenile court has an affirmative and continuing duty in all dependency proceedings to inquire into a child's Indian status. (§ 224.3[, subd. ](a).) If a court determines it has reason to know a child is an Indian child, the court must notify the BIA and any relevant tribe so that the tribe may determine the child's status and decide whether to intervene. (§ 224.2.) If adequate and proper notice has been given, and if neither the BIA nor any tribe provides a determinative response within 60 days, then the court may determine that ICWA does not apply to the proceedings. (§ 224.3[, subd. ](e)(3).) At that point, the court is relieved of its duties of inquiry and notice (§ 224.2, subd. (b)), unless the BIA or a tribe subsequently confirms that the child is an Indian child (§ 224.3[, subd. ](e)(3)). . . . [¶] . . . Notice must be provided 'where the court knows or has reason to know that an Indian child is involved' (25 U.S.C. § 1912(a)), and section 224.3, subdivision (b) sets forth a nonexhaustive list of 'circumstances that may provide reason to know the child is an Indian child.' Importantly, '[t]he relevant question is not whether the evidence . . . supports a finding that the minor[] [is an] Indian child[]; it is whether the evidence triggers the notice

16

requirement of ICWA so that the tribes themselves may make that determination.'
[Citation.] After proper notice has been given, if the tribes respond that the minor is not a member or not eligible for membership, or if neither the BIA nor any tribe provides a determinative response within 60 days, then the court may find that ICWA does not apply to the proceedings. At that point, the court is relieved of its duties of inquiry and notice unless the BIA or a tribe subsequently confirms that the child is an Indian child. ' "To maintain stability in placements of children in juvenile proceedings, it is preferable to err on the side of giving notice and examining thoroughly whether the juvenile is an Indian child." ' " (*Isaiah W.,* at pp. 14–15, citing *In re D.C.* (2015) 243 Cal.App.4th 41, 63.) *Isaiah W.'s* strict compliance with ICWA's notice requirement enforces our view *Abbigail A.* did not intend to call *J.T.*'s holding into question.

In this case, the information provided by parents concerning the minors' potential Indian ancestry was sufficient to trigger a duty of inquiry and notice under both state and federal law. (See *Kadence P., supra*, 241 Cal.App.4th at pp. 1386–1388 and cases cited therein.) No one argues otherwise, and the trial court found it sufficient to require notice to two of 22 Pomo-affiliated tribes. In light of the authorities examined above, the trial court erred in failing to require notice to the remaining Pomo-affiliated tribes.

When the record shows noncompliance with ICWA's notice requirements, the remedy is a limited remand to the juvenile court with directions to direct the Agency to comply with the notice provisions of ICWA. Upon remand the juvenile court shall direct the Agency to send ICWA notice to all unnoticed Pomo-affiliated tribes in accordance with ICWA and California law. The Agency shall thereafter notify the court of its actions and file certified mail, return receipts for any ICWA notices that were sent, together with any responses received. The court shall then determine whether the ICWA inquiry and notice requirements have been satisfied and whether O.C. and M.C. are Indian children. If the court finds they are Indian children, the court shall conduct a new permanency planning hearing (§ 366.26), as well as all further proceedings, in

17

compliance with ICWA and related California law.  If, after proper notice, the court finds that O.C. and M.C. are not Indian children, the order terminating parental rights and selecting adoption as the permanent plan shall be reinstated.

## II.  *Adoptability*

The juvenile court found by clear and convincing evidence that minor M.C. is both generally and specifically adoptable.  Mother argues the court's finding of adoptability for M.C. is not supported by clear and convincing evidence because "neither the adoption assessment, nor the rest of the record in this case, establish that this child is likely to be adopted within a reasonable time."  We disagree.

The juvenile court may terminate parental rights only if it determines by clear and convincing evidence that it is likely the child will be adopted within a reasonable time. (§ 366.26, subd. (c)(1); *In re Jennilee T.* (1992) 3 Cal.App.4th 212, 223.)  " ' " 'Clear and convincing' evidence requires a finding of high probability.  The evidence must be so clear as to leave no substantial doubt.  It must be sufficiently strong to command the unhesitating assent of every reasonable mind." ' "  (*In re Jerome D.* (2000) 84 Cal.App.4th 1200, 1205.)

A determination of adoptability is reviewed for substantial evidence.  (*In re R.C.* (2008) 169 Cal.App.4th 486, 491 (*R.C.*); *In re Lukas B.* (2000) 79 Cal.App.4th 1145, 1154.)  "If, on the entire record, there is substantial evidence to support the findings of the juvenile court, we must uphold those findings.  We do not pass on the credibility of witnesses, attempt to resolve conflicts in the evidence or weigh the evidence.  [Citations.] Rather, our task is to determine whether there is substantial evidence from which a reasonable trier of fact could find, by clear and convincing evidence, that the minor is adoptable.  [Citation.]  The appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the finding or order."  (*R.C.*, at p. 491; *In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.)

"The issue of adoptability requires the court to focus on the child, and whether the child's age, physical condition, and emotional state make it difficult to find a person willing to adopt. [Citations.] It is not necessary that the child already be placed in a preadoptive home, or that a proposed adoptive parent be waiting. [Citations.] However, there must be convincing evidence of the likelihood that adoption will take place within a reasonable time." (*In re Brian P.* (2002) 99 Cal.App.4th 616, 624.) "The fact that the child is not yet placed in a preadoptive home nor with a relative or foster family who is prepared to adopt the child, shall not constitute a basis for the court to conclude that it is not likely the child will be adopted." (§366.26, subd. (c)(1).) If the child *is* in a preadoptive home, but is generally adoptable, questions concerning the suitability of the prospective adoptive parents are irrelevant and impermissible in a section 366.26 hearing. (*R.C., supra*, 169 Cal.App.4th at p. 494; *In re Carl R.* (2005) 128 Cal.App.4th 1051, 1061 (*Carl R.*); *In re Scott M.* (1993) 13 Cal.App.4th 839, 844 (*Scott M.*).) "Rather, a caregiver's willingness to adopt serves as further evidence the minor is likely to be adopted within a reasonable time either by the caregiver 'or by some other family.' " (*R.C.,* at p. 494, italics omitted.) "The statutory scheme requires the Agency to provide the court with a preliminary assessment of the eligibility and commitment of the prospective adoptive parents for the section 366.26 hearing. That assessment includes a social history, screening for criminal records and prior referrals for child abuse or neglect, together with an assessment of the capability of the prospective adoptive parents to meet the child's needs, and whether they understand the legal and financial rights and responsibilities of adoption." (*Carl R.,* at pp. 1062–1063.)

Mother argues that M.C.'s autism diagnosis and related behavioral issues have made it difficult for the agency to find appropriate services for him, created problems for his caregivers, required constant monitoring and a high level of care, and resulted in a number of placement changes. Mother also launches an attack on the prospective parent's suitability as a foster parent. She notes the prospective parent already has five

disabled adopted children, has three caregivers to help her take care of them, and once made a mistake about M.C.'s nighttime medications, which she rectified when it was brought to her attention. Further, due to licensing issues, which were subsequently cleared up, M.C. previously had to leave her home. However, if the child is considered generally adoptable, we do not examine the suitability of the prospective adoptive home. (*Scott M.*, *supra*, 13 Cal.App.4th at p. 844.)[12] Given the court's finding of general adoptability, whether M.C. was *also* specifically adoptable by a particular person is irrelevant. (*Scott M.,* at p. 844; *In re Sarah M., supra,* 22 Cal.App.4th at p. 1650; *In re T.S.* (2003) 113 Cal.App.4th 1323, 1329.)

In any event, these facts were disclosed to the court and considered by the social worker and the adoptions specialist who recommended the court find M.C. adoptable. The first section 366.26 report (filed July 30, 2015), acknowledged the severity of M.C.'s limitations in the areas of verbal communication, social interactions, and ability to build connections with others and the challenging nature of his behavior. Nevertheless, M.C.'s paternal aunt and her partner in Seattle had come to California to visit M.C. and O.C. and had expressed interest in adopting both boys. Unfortunately, due to the aunt's criminal history, a home study was denied. The report also revealed a former foster parent who had cared for M.C. and O.C. for a long time, was "very interested in taking [M.C.] back

---

[12] To the extent mother's attack on the prospective adoptive parent is intended as an argument there is no substantial evidence to support a finding of specific adoptability, we reject it. Where the child is deemed adoptable based *solely* on the fact that a particular family is willing to adopt him or her, the trial court must determine whether there is a legal impediment to adoption. (See, e.g., *In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1650; *Carl R.*, *supra,* 128 Cal.App.4th at p. 1061; *In re Valerie W.* (2008) 162 Cal.App.4th 1, 15.) Mother does not identify any legal impediment to adoption or argue one exists here. " 'General suitability to adopt is a subjective matter which does not constitute a legal impediment to adoption. If inquiry into the suitability of prospective adoptive parents were permitted in section 366.26 hearings, we envision that many hearings would degenerate into subjective attacks on all prospective adoptive families in efforts to avoid termination of parental rights. Such a result is not envisioned by the statutory scheme.' " (*In re Sarah M.,* at p. 1650.)

into her home when another child leaves her care. . . . The reason the children had to move from this placement originally was due to licensing regulations and the number of children living in the home at that time. This issue has since then been corrected. The Agency feels that this foster parent should be considered for long term placement of [M.C.] because of her skill and commitment to work with not only [M.C.], but children with special needs. She formed a very strong connection to [M.C.] and would be will to provide a safe home for him and maintain visitation with his brother [O.C.], in his future placement. [¶] . . . [¶] [M.C.] has a connection with his former foster parent, who is interested in being considered as an adoptive placement. [M.C.] was doing the best in her home and had a very structured school program that he was attending while living there. His teacher in the special needs program . . . worked very closely with [M.C.]. When [M.C.] was moved from that foster home and away from his school, another foster parent observed [M.C.], writing [the teacher's name] all over pieces of paper, in [an] attempt to possibly communicate some form of connection or loss over the relationship."

In conclusion, the social worker's report acknowledged the challenges facing the Agency in finding appropriate placements for M.C. and O.C., but indicated that State Adoptions was in the process of searching for "families that would be interested in providing a permanent home for these children," and expressed the belief that the information in the report and its attachments "establish[es] clear and convincing evidence that termination of parental rights would not be detrimental to the children and that the children have a probability for adoption." Among the attachments is an adoptions assessment by adoptions specialist Janice Milthaler, MSW, which provides a detailed look at M.C.'s diagnoses, current functioning, and prospects for adoption and the Agency's efforts to find a suitable adoptive home. At that juncture, the specialist recommended the court order a permanent plan of adoption without terminating parental rights, and order "additional efforts be made to locate an appropriate adoptive family for a period of 180 days, at which time a hearing shall be held."

21

After the section 366.26 hearing was continued, an updated section 366.26 report and adoption assessment was filed on January 14, 2016. M.C. was now in a preadoptive home with his former foster mother, who stated "she is delighted to have him in her home again. [M.C] is thriving in her home and back in his school setting he was so familiar with and loved. Foster mother reports that [M.C.] states to her 'safe,' which means he feels safe in her care and home. Foster mother reports he is doing very well in school and at home."

The social worker discussed the medication issue to which mother alludes. On November 12, 2015, the school had reported that M.C. appeared overmedicated at school. The foster mother stated she had given M.C. an extra dose of Clonidine that night when he woke up yelling and screaming. When the social worker asked to see M.C.'s pill bottle to compare dosages and numbers of pills remaining, the foster mother explained she had other children in the home who also took Clonidine, so she had put all the pills in one container. The social worker advised foster mother it was necessary to keep the pills for each child in a separate container; foster mother stated she did not know this. The issue was resolved by obtaining a larger medication lock box. At a December visit the pills were counted and no problem was detected.

The updated adoptions assessment also reported that on October 2, 2015, M.C. had been placed with the foster mother who had previously cared for him for six months in her home. She wished to adopt him. M.C. was reported to be "very sweet and affectionate" and "loved by many," but in the past had been difficult to place because of his autism and its related communication deficits. However, "[h]is behaviors have stabilized greatly since his return to the home of his previous caregiver and potential adoptive parent." The specialist had observed M.C. in several of his previous placements and reported "[h]e has shown attachment to his current family since being placed back with the current caregiver and has repeatedly stated the words 'safe' and 'home.' " In her

22

opinion, "the transition from foster care to adoption can occur with minimal disruption for [M.C.] if he remains in his present placement."

The potential adoptive mother has a Bachelor's degree and credit hours toward her Master's degree with a teaching credential. She is a stay-at-home mother of five adopted special needs children ranging in age from five to 21, but she previously worked for eight years as a teacher of autistic children at the local elementary school. Because of her children's high needs, she has a staff of three women to help her. She has no criminal or child abuse record and understands and accepts the legal and financial responsibilities of an adoptive parent. The adoptions specialist opined that the potential adoptive mother appeared to demonstrating good parenting practices and was capable of meeting M.C.'s needs. She was committed to M.C. and had expressed a desire to adopt him. For his part, M.C. has a "dependent and nurturing relationship with his potential adoptive family and would benefit from the establishment of a permanent parent/child relationship through adoption. [M.C.] appears to have substantial emotional ties to the potential adoptive parent and the other children in the household. He looks to his potential adoptive mother for the basics of food, clothing, shelter, affection, guidance, medical attention, and safety. Based on current information removal from the potential adoptive parent would be detrimental to the child's well-being."

In our view, the social worker's and the adoption specialist's reports provided ample explanation for their opinions that an adoptive placement could be found for M.C. within a reasonable time. The reports did not whitewash M.C.'s behavioral issues and history, or cover up mistakes made by the adoptive mother. The court had a complete picture of the situation before it made its adoptability finding. The fact that another family—that of M.C.'s aunt and her partner—also sought to adopt him, underscores the correctness of the juvenile court's finding that, considering all the statutory factors, and despite his disabilities, M.C. is a generally adoptable child.

## III. Sibling Bond

Section 366.26 provides in relevant part: "If the court determines . . . by a clear and convincing standard, that it is likely the child will be adopted, the court shall terminate parental rights and order the child placed for adoption . . . [¶] . . . [¶] [unless] [t]he court finds a compelling reason for determining that termination would be detrimental to the child due to one or more of the following circumstances: [¶] . . . [¶] (v) There would be substantial interference with a child's sibling relationship, taking into consideration the nature and extent of the relationship, including, but not limited to, whether the child was raised with a sibling in the same home, whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and whether ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption." (§ 366.26, subd. (c)(1)(B)(v).) The focus of the exception is on the detriment to the otherwise adoptable child, not on the detriment to his or her siblings, from severance of the sibling relationship. (*In re Celine R.* (2003) 31 Cal.4th 45, 49–50, 54.) "[T]he application of this exception will be rare, particularly when the proceedings concern young children whose needs for a competent, caring and stable parent are paramount." (*In re Valerie A.* (2007) 152 Cal.App.4th 987, 1014.)

"To show a substantial interference with a sibling relationship the parent must show the existence of a significant sibling relationship, the severance of which would be detrimental to the child." (*In re L.Y.L.*, *supra*, 101 Cal.App.4th at p. 952.) We review the juvenile court's finding regarding the sibling relationship for substantial evidence. (*Id.* at p. 947.)

Here, the court found the sibling relationship exception did not apply. That finding is supported by substantial evidence. Although earlier in the dependency the two brothers had been placed together, this arrangement was not beneficial to M.C. or O.C. In the last adoption assessment, the adoptions specialist reported: "[M.C.] and [O.C.]

24

have a very unsupportive relationship as [O.C.] would constantly tease [M.C.] when they were placed together and it was an unhealthy situation for both boys. When visiting in the past, [M.C.] would go to other side of room to avoid [O.C.]. Currently, neither asks to see the other."

Mother does not argue the brothers share a significant sibling bond. Instead, she argues that since both boys are autistic, however troubled the bond they share with each other, it "may be as strong [a bond] as they are able to build with anyone," and should be preserved because it "may serve as a vital anchoring point as [M.C.] moves through the juvenile dependency system, unlikely to be adopted." Mother's argument is not persuasive. As discussed above, we disagree with mother's premise that M.C. is not likely to be adopted, and the record shows M.C. has begun in fact to form bonds of trust and affection with his prospective adoptive family. Substantial evidence supports the juvenile court's finding the benefits M.C. would gain from the stability and permanence of an adoptive home outweigh the potential for detriment from substantial interference with his relationship to O.C. (*In re Celine R., supra,* 31 Cal.4th at p. 61; *In re Naomi P.* (2005) 132 Cal.App.4th 808, 823.)

## DISPOSITION

The order of February 9, 2016 is reversed. The case is remanded to the juvenile court with directions to order the Agency to complete notice to the Pomo tribes in accordance with ICWA. If, after proper notice, the court finds that O.C. and M.C. are Indian children, the court shall proceed in conformity with ICWA. If, after proper notice, the court finds that O.C. and M.C. are not Indian children, the order terminating parental rights and selecting adoption as the permanent plan shall be reinstated.

25

                             _____

                             Dondero, J.

We concur:


_____

Margulies, Acting P. J.


_____

Banke, J.

A 147577  *In re O.C.*

Trial Court:             Mendocino County Superior Court

Trial Judge:            Hon. David Riemenschneider

Counsel:

Jamie A. Moran, under appointment by the Court of Appeal, for Defendant and Appellant Mother

Law Office of Linda J. Conrad, Linda J. Conrad, under appointment by the Court of Appeal, for Defendant and Appellant Father

Katharine L. Elliott, Mendocino County Counsel, Douglas V. Parker, Deputy County Counsel, for Plaintiff and Respondent