Filed 5/21/24  In re B.C. CA2/4

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re B.C., <br><br> a Person Coming Under the Juvenile Court Law. | B331752 <br><br> (Los Angeles County  Super. Ct. No. 22CCJP00355) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br>     Plaintiff and Respondent, <br><br>     v. <br><br> E.P., <br><br>     Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Mary E. Kelly, Judge.  Affirmed.

Elizabeth Klippi, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Veronica Randazzo, Deputy County Counsel, for Plaintiff and Respondent.

## INTRODUCTION

E.P. (father) appeals from the juvenile court's order terminating his parental rights with respect to his son, B.C.[1]  Father raises a single issue: whether the Los Angeles Department of Children and Family Services (Department) properly inquired into B.C.'s Indian ancestry, as required by the Indian Child Welfare Act (25 U.S.C. § 1901 et seq.) (ICWA) and related state law.  We hold that the Department's inquiry was incomplete.  However, we conclude that the Department's omission was harmless.  Therefore, we affirm the orders of the juvenile court.

## FACTUAL AND PROCEDURAL BACKGROUND

B.C. was born in January 2022.  The Department filed a dependency petition on behalf of B.C. under Welfare and Institutions Code section 300, subdivision (b)(1).[2]  The petition alleged that B.C. tested positive for amphetamines at birth, as did his mother, M.C. (mother), immediately prior to birth.  The petition also alleged that father knew or should have known about mother's substance use and failed to protect B.C.  In the ICWA attachment to the petition, the Department indicated that it had questioned mother about the child's Indian status.  Mother denied that B.C. had Indian ancestry.

The Department's initial interview with mother revealed that she had one other child, 17 years old and living in the Philippines.  Mother told the Department that she had no family other than her own mother and the other

---

[1]  The child's mother is not a party to this appeal.

[2]  All subsequent statutory references are to the Welfare and Institutions Code, unless otherwise stated.

2

child.  She refused to provide a name or contact information for either one.  Mother herself had been born in the Philippines.

On February 1, 2022, the juvenile court held a detention hearing.  Mother's counsel filed a Parental Notification of Indian Status form (ICWA-020) on her behalf which said that mother had "no Indian ancestry as far as I know."  However, counsel had used a superseded version of the form,[3] and it was not signed.  Mother did not sign any documents involved in this case, or personally appear at any of the hearings.

The court observed that mother had completed the form but opted to defer its full determination of ICWA status until father could be interviewed.  The court's minute order found no "reason to know that ICWA applies as to Mother."  The court ordered B.C. detained from both parents, though the detention from father was on an emergency basis.

The next day, father's counsel filed an ICWA-020 form on his behalf, which indicated that father had no Indian ancestry.  The juvenile court held another detention hearing with respect to father.  The court inquired if "all of" mother's family was "from the Philippines."  Counsel responded that mother was not present.  The court then said that it had "already made that finding."  The court asked the Department to pursue the ICWA inquiry with father's parents and grandmother.  The court ordered B.C. detained from father.

On March 29, 2022, at the adjudication hearing, the court sustained the petition and ordered family reunification services.  In September 2022, the Department filed a status review report indicating that the court had already found no reason to know that ICWA would apply to mother.  The

---

[3]     The version used had been adopted by the Judicial Council in 2008; the current version was adopted in 2020.

report also recommended that the court make the same ICWA finding with respect to father.

In November 2022, the court held a review hearing. In a last-minute information statement filed just before the hearing, the Department reported that father had contacted mother's son in the Philippines. This had occurred during father's supervised visit with B.C. The court again found "no reason to believe ICWA applies in this matter."

In August 2023, the Department identified three possible relatives for mother. The Department called one, and sent letters to the other two. There was no response.

On September 6, 2023, the juvenile court terminated the parental rights of both father and mother. Father timely appealed.

## DISCUSSION

While father concedes that the Department's inquiry into his own side of the family was adequate, he argues that the Department failed to question mother's relatives about potential Indian ancestry on her side. The Department argues that there was no error because mother's failure to participate in the process prevented them from locating her relatives. The Department also argues, in the alternative, that any error was harmless.

I.      *Legal Framework and Standard of Review*

ICWA exists "to protect Indian children and to promote the stability and security of Indian tribes and families by establishing minimum federal standards that a state court . . . must follow before removing an Indian child from his or her family." (*In re Austin J.* (2020) 47 Cal.App.5th 870, 881.) ICWA defines "Indian child" to mean any unmarried person who is under 18

4

and is either (a) already a member of an Indian tribe or (b) both eligible for membership in an Indian tribe and the biological child of a member of a tribe. (25 U.S.C. § 1903(4).) California law adopts the ICWA definition. (§ 224.1, subd. (a).)

Both the juvenile court and the Department have an ongoing duty to inquire whether a child qualifies under that definition. (*In re N.F.* (2023) 95 Cal.App.5th 170, 176 (*N.F.*).) This duty applies in three phases: the initial inquiry, any further inquiry, and formal notice to the relevant tribe or tribes. The initial inquiry is the phase at issue here.

Upon initial contact with the child, the Department must ask those involved if they have any information about the child's heritage. (*N.F., supra,* 95 Cal.App.5th at p. 176.) If the Department takes the child into temporary custody (as it did here), the department must inquire of "the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect." (*Id.* at p. 177, quoting § 224.2 subd. (b).)

The court may find that there is "no reason to know" that the child is an Indian child and that ICWA does not apply. (*N.F., supra,* 95 Cal.App.5th at p. 177.) Such a finding is an implied predicate to any order terminating parental rights. (*In re Isaiah W.* (2016) 1 Cal.5th 1, 10–15.) We review for substantial evidence. (*In re H.V.* (2022) 75 Cal.App.5th 433, 438.) Any parent may challenge ICWA compliance. (*In re O.C.* (2016) 5 Cal.App.5th 1173, 1180, fn. 5.)

If the Department makes an error in its inquiry, "our examination as to whether substantial evidence supports the juvenile court's ICWA finding ends up turning on whether that error by the Department was harmless." (*In re Dezi C.* (2022) 79 Cal.App.5th 769, 777, review granted Sept. 21, 2022, No.

S275578.)  While there is a split of authority regarding the standard for harmless error, we follow *Dezi C.* in looking to see if "the record contains information suggesting a reason to believe" that further inquiry "might lead to a different result." (*Dezi C., supra,* 79 Cal.App.5th at p. 779.)[4]

## II.    *Inquiry*

Appellant argues that the Department failed to interview members of mother's extended family.  This assumes that there were extended family members available to interview.  (See *In re H.B.* (2023) 92 Cal.App.5th 711, 720.)  When the Department first interacted with mother, she was in the hospital alone.  She did not reside with any relative other than father.  Nor did mother identify any other family members in a way which would allow the Department to locate them.

Mother denied having any family other than her own mother and another child, for whom she gave neither name nor contact information. Mother told the Department that she had no relationship with her mother, and that her other child lived in the Philippines.  After that initial interview, mother took no part in the proceedings, with either the Department or the court.  Mother did not appear at any court hearings.  She did not attend her scheduled interview with the Department.  On those occasions when the Department was able to reach her, she did not engage.

There are only two instances in the record where possible relatives of mother appear.  The first occurred when father spoke with mother's child in the Philippines over Facetime, during a monitored visit with B.C.; father told the Department monitor that he was planning on sending money to the

---

[4]    Neither party argues for a different standard.

6

child.[5]  The second occurred when a records search turned up three people with related names.[6]  One of those possible relatives was associated with a series of phone numbers but no address; three of the numbers were disconnected and messages were left on the other two.  The other two possible relatives were associated with an address but no phone number; letters were sent to that address.

Once the Department has a clear lead on a close maternal relative, it has an obligation to follow up.  (*In re Y.W.* (2021) 70 Cal.App.5th 542, 552–553.)  In this case, the Department fulfilled that obligation with respect to the three potential relatives discovered late in the proceedings.  The Department called the phone numbers it had and sent letters to the addresses it had.

However, the Department did not fulfil its obligation with respect to the other child.  Father's contact with B.C.'s sibling over Facetime during a monitored visit put the Department on notice that father might have a means to contact the sibling.  The sibling, in turn, might have provided a means of contacting mother's mother.  Failure to inquire of father about how to contact B.C.'s sibling was a breach of the Department's duty of inquiry.

III.    *Harmlessness*

Although we conclude that the Department breached its duty, the record gives us no reason to believe that further inquiry would lead to a

---

[5]    Father's briefing does not mention this contact.  The respondent's brief notes but does not discuss it.

[6]    Father complains that the records search was belated, but this argument is not well taken.  The Department is not obliged to "cast about" in public records looking for extra information.  (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1053; see also *In re H.B., supra,* 92 Cal.App.5th at p. 720.)

different result. (*Dezi C., supra,* 79 Cal.App.5th at p. 779.) Such a reason would exist where (a) the Department never followed up on a report of possible Indian heritage, (b) the Department never inquired about one parent at all, or (c) there is some indication that a parent may not be able to accurately self-report. (*Ibid.*) None of those categories apply here.

There was never any report of possible Indian heritage on which the Department could follow up. Nor does the record show that the Department failed to inquire of mother at all. Father attempts to cast doubt on the Department's initial inquiry, noting that the details of the exchange do not appear in the detention report, and that the Department made no subsequent inquiry of mother. But the record does show that the Department asked mother if she had any Indian ancestry, and she denied any such heritage.

Father attempts to put this case in the third category, citing to *In re Y.W., supra*, 70 Cal.App.5th 542. But in that case, the parent had been adopted and the Department had neglected to obtain the contact information of her biological parents. (*Id.* at pp. 548–549, 555.) Here, there is no indication that mother was adopted or was otherwise unable to accurately report her heritage.

Father points out that the record contains no summary of mother's familial background. But according to mother, there was little family background to summarize. There was only her mother and the other child. And there is no evidence to suggest that questioning them would produce any different information. Therefore, the Department's error was harmless.

**DISPOSITION**

The orders terminating parental rights are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


ZUKIN, J.

WE CONCUR:


COLLINS, Acting P. J.


MORI, J.